PUBLIC SERVICE COMPANY OF
INDIANA, INC., Peabody Coal
Company, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Louisville & Nashville Railroad Compa-
ny, Association of American Railroads,
National Association of Regulatory
Utility Commissioners, Intervenors.

PUBLIC SERVICE COMPANY OF
INDIANA, INC., Peabody Coal
Company, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

National Association of Regulatory Utili-
ty Commissioners, Association of
American Railroads, Seaboard System
Railroad, Inc., Intervenors.

Nos. 82–2399, 83–1691.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 28, 1984.

Decided Nov. 23, 1984.

As Amended Nov. 23, 1984.

J. Raymond Clark, Washington, D.C., with whom Mary Todd Foldes and C. Michael Loftus, Washington, D.C., were on the brief for petitioners.

Charles D. Gray, Washington, D.C., with whom Paul Rodgers and Genevieve Morelli, Washington, D.C., were on the brief for intervenor NARUC. Deborah A. Dupont, Washington, D.C., also entered an appearance for NARUC in No. 82–2399.

Edward O'Meara, Atty. I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., John J. Powers, III and John P. Fonte, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief for respondents.

Rutherford Lyle Key, Jr., Jacksonville, Fla., for intervenors Seaboard System Railroad, Inc. Charles M. Rosenberger, Jacksonville, Fla., also entered an appearance for Seaboard System Railroad, Inc. in No. 83–1691.

Stephen Ailes, Betty Jo Christian and Samuel M. Sipe, Jr., Washington, D.C., were on the brief for intervenor Association of American Railroads.

Before GINSBURG, Circuit Judge, MacKINNON, Senior Circuit Judge, and HAROLD H. GREENE [*], District Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

This case involves a challenge under the Staggers Act to an order of the Interstate Commerce Commission ("ICC") that vacated a rate authorized by the Public Service Commission of Indiana ("Indiana Commission") for the intrastate rail carriage of coal, and reinstated the railroad's prior existing rate. Petitioners challenge the ICC's authority to set the rate aside. The ICC's opinion demonstrates that the Indiana rate was unlawfully set under the Staggers Act. Our nation's railroads have been subjected to intense Government regulation since 1887. The Staggers Act, enacted in 1980, sought to alleviate the tremendous financial problems plaguing the railroad industry. The enormity of the problem was indicated by Congress' finding, *inter alia*, that—

> (6) earnings of the railroad industry are the lowest of any transportation mode and are insufficient to generate funds for necessary capital improvement;
>
> (7) By 1985, there will be a capital shortfall within the railroad industry of between $16 [billion] and $20 [billion] ...

Pub.L. No. 96–448, § 2, 96th Cong., 2d Sess., 94 Stat. 1896 (Oct. 14, 1980). Because we find that the ICC properly exercised its authority, we affirm.

## I. BACKGROUND

Public Service Company of Indiana (the Utility) operates a bituminous coal-fired electric generating station at Cayuga, Indiana. Virtually all of the coal used in the plant is supplied by the Peabody Coal Company (Peabody) Universal Mine at Clinton, Indiana, which is 26.4 miles south of the Utility's generating station. The coal, about 2.5 million tons annually, is carried between the mine and the generating plant by the Louisville & Nashville Railroad (L & N),[1] using cars owned by the Utility. The route lies entirely within the state of Indiana. The Indiana Commission has initial jurisdiction under the Staggers Act over such intrastate rates.[2]

---

[*] Of the United States District Court for the District of Columbia, sitting by designation pursuant to Title 28 U.S.C. § 292(a).

1. The L & N no longer has a separate corporate existence. It is now part of the Seaboard System Railroad, Inc. (Seaboard). Seaboard is an intervening party in this case.

2. The Indiana Commission is a three-member body; each Commissioner is appointed by the Governor for a four-year term. Two of the three must be lawyers, and no more than two can be members of the same political party. Ind.Stat.Ann. § 8–1–1–2 (Burns 1973).

A. *The Indiana Commission Proceedings*

Before this case was initiated the Indiana Commission had, on September 12, 1980, upheld as reasonable the existing rate of $.69 per net ton for carriage of coal between the two points. By 1981, further increases raised L & N's rate to $.94/ton (Joint Appendix (JA) 140).[3] On March 27, 1981, the Utility and Peabody challenged the rate in an action before the Indiana Commission; a year and a half later, the complainants prevailed.[4]

At the hearing before the state commission, petitioners offered evidence that the L & N's variable cost of service in carrying the coal was $.39.1/ton. The L & N countered, claiming that its variable cost was $.46.6/ton. Calling the L & N's figures inaccurate, the Indiana Commission adopted the petitioners' $.39.1 figure. Indiana Decision at 16 (JA 150). The Indiana Commission determined that the *full* cost of service was $.55.8/ton, and that under ICC standards the "fully allocated costs of the subject movement are now 59 cents per net ton;" these costs, according to the Indiana Commission, *included* a pre-tax return on investment of 25.8%. *Id.* The Indiana Commission then acknowledged that the L & N was a revenue *inadequate* railroad, and that the L & N was thus entitled to use differential pricing—*i.e.*, to charge rates above fully allocated costs to captive customers such as the Utility and Peabody. In the pivotal aspect of its decision, however, the Indiana Commission further held that the L & N could adopt differential

pricing *only if* its management was "honest, efficient, and economical."[5] Indiana Decision at 19 (JA 153).

In support of the "inefficiency" contention, the Indiana Commission placed substantial reliance upon L & N's pricing practices. The Commission also observed that the L & N did not rely on sophisticated marketing tools in setting its rates; that the profit margin of the L & N was lower than that of the CSX Corporation (CSX),[6] its parent corporation, and lower than that of the Southern Railway System (Southern), a competitor; and that inefficient management *could* be a cause of those discrepancies. Expert testimony also made several efficiency comparisons with Southern, and stated that the L & N was less efficient than Southern. The Indiana Commission found that a *prima facie* case of inefficiency had been established, and placed the burden of rebutting it upon the L & N. Indiana Decision at 19 (JA 153). The L & N allegedly did not meet that burden: The Indiana Commission held that because of "inferior profit margin" (Ind. Comm.Order, ¶ 66) and inferior use of equipment, the L & N was inefficient. The Commission also found that the railroad merely guessed at the best rate to charge on competitive traffic, and then tried to make up the difference on captive traffic. *Id.* at 24 (JA 158). Because the L & N was thus "inefficient," the Indiana Commission held that the "just and reasonable rate" would be $.55.8/ton—the fully allocated *cost* of service. *Id.* The Indiana Commis-

---

3. The actual rate structure is very complicated, because various parts of the rate were subject to litigation in the Seventh Circuit, and some increases were not being collected because of that litigation (JA 140). Some increases had been instituted and abandoned, pending the outcome of litigation. The total rate, assuming the L & N prevailed in the other litigation, would have been $1.03/ton. The $.94/ton figure, however, is the actual rate in effect at the time of this case, and constitutes the rate determined and authorized by the ICC in this case. The other litigation appears irrelevant to this case.

4. Complaint Against and Request for Reduction in the Intrastate Freight Local Unit Train Tariff on Bituminous Coal, Carloads from Clinton to

Cayuga, Indiana, as Presently Set Forth in Louisville & Nashville Railroad Company Freight Tariff L & N 4278 and Supplements Thereto: Order Determining Threshold Jurisdiction Market Dominance and Rate Reasonableness, Clause No. 36431 (Public Service Commission of Indiana) (Sept. 17, 1982) (hereinafter "Indiana Decision") (JA 135).

5. *See* 49 U.S.C. § 10704(a)(2) (1982); *see also id.* § 10707a(e)(2)(B) (Long-Cannon amendment).

6. The CSX Corporation is a holding company that also includes two other Class I railroads, the old Chesapeake and Ohio (Chessie) and Seaboard Railroad.

sion, though, is forbidden by the Staggers Act from setting rates below a certain point; at the time of its decision it could not set a rate below 165% of variable cost. *See* 49 U.S.C. § 10709(d)(2) (1982).[7] Under that provision, which constitutes a jurisdictional threshold, the *minimum* rate that could be set was $.65/ton (*i.e.*, 1.65 × $.39.1). So in its Order, the Indiana Commission set the rate, based on their construction of the facts and the law, at the lowest possible rate of $.65/ton. Indiana Decision at 24–25 (JA 158–59).

### B. *The ICC Decision*

The L & N promptly appealed the Indiana Decision to the ICC, which has jurisdiction to review intrastate rates under the Staggers Act. 49 U.S.C. § 11501(c); *see generally Utah Power & Light v. ICC*, 747 F.2d 721, (D.C.Cir.1984). The ICC found that the Indiana Commission had applied federal law incorrectly, and vacated the $.65 rate. *Petition of Louisville & Nashville Railroad Co. for Review of a Decision of the Public Service Commission of Indiana Pursuant to 49 U.S.C. 11501*, No. 38946, slip op. (I.C.C. Nov. 22, 1982) (hereinafter "ICC November Decision") (JA 69). In its decision the ICC determined that the L & N's existing $.94 rate was "appropriate," and authorized the railroad to continue that rate.

The Utility and Peabody promptly petitioned for review in this court and the National Association of Regulatory Utility Commission (NARUC) intervened; that

proceeding is No. 82–2399. In addition, the Utility and Peabody *subsequently* moved the ICC to reopen its decision, and the L & N moved for clarification. The ICC reopened its proceedings, and moved this court to stay our consideration pending final administrative resolution of the matter; petitioners responded that they did not oppose a limited stay. On March 28, 1983, this court issued an order that, in effect, stayed our review and allowed the ICC to conduct its reopened proceedings. *Public Service Co. of Indiana v. ICC*, No. 82–2399 (D.C.Cir. Mar. 28, 1983) (interim order). As a result, while No. 82–2399 was pending before us, but before oral argument, the ICC issued a second opinion in this case. *Petition of Louisville & Nashville Railroad Co. for Review of a Decision of the Public Service Commission of Indiana Pursuant to 49 U.S.C. 11501*, No. 38946, slip op. (I.C.C. June 17, 1983) (hereinafter "ICC June Decision") (JA 6). The ICC acknowledged that its first opinion was unclear, and therefore it offered a fuller explanation of its decision. Petitioners seek review of the second opinion in No. 83–1691, now consolidated with No. 82–2399 for our review. In attacking the decision of the ICC, petitioners defend the decision of the Indiana Commission as consistent with all applicable federal standards, contend that the ICC impermissibly substituted its judgment for the factual findings of the state Commission, and argue that the ICC unlawfully authorized the existing L & N rate.

---

7. 49 U.S.C. § 10709(d)(2) provides:

In making a determination under this section, the Commission shall find that the rail carrier establishing the challenged rate does not have market dominance over the transportation to which the rate applies if such rail carrier proves that the rate charged results in a revenue-variable cost percentage for such transportation that is less than—

(A) 160 percent during the period beginning on the effective date of the Staggers Rail Act of 1980 and ending September 30, 1981;

(B) *165 percent during the period beginning October 1, 1981, and ending September 30, 1982;*

(C) 170 percent during the period beginning October 1, 1982, and ending September 30, 1983;

(D) 175 percent or the cost recovery percentage, whichever is less, during the period beginning October 1, 1983, and ending September 30, 1984; and

(E) the cost recovery percentage, during each 12-month period beginning on or after October 1, 1984.

For purposes of subparagraphs (D) and (E) of this paragraph, the cost recovery percentage shall in no event be less than a revenue-variable cost percentage of 170 percent or more than a revenue-variable cost percentage of 180 percent. (Emphasis added.)

It is worth noting that the Indiana PSC decided to set the rate at the 165 percent threshold *just two weeks* before the threshold was to be increased to 170 percent. *Id.*

## II. The Propriety of ICC's Second Opinion

We must address a threshold procedural issue before turning to the merits of the case. Petitioners contend that the *second* opinion issued by the Commission should not be considered in this case, but that our review must be limited to the first opinion. We decline to so limit our review in this case. As we have already indicated, the ICC's second opinion was issued in response to petitioners' motion to reopen and to the L & N's motion for clarification. The second opinion reflects a change in Commission membership and participation—Commissioner Simmons, who dissented from the first opinion, left the Commission; Chairman Taylor, who did not take part in the first opinion, dissented in the second opinion. Moreover, the second opinion, adopted by the Commission on a 3–1 vote, shows that the issues were reconsidered by the full Commission.

Petitioners request that we ignore the Commission's second opinion is based on the theory that it is nothing more than an impermissible *"post hoc* rationalization unsupported in the original decision." Petitioners' December, 1983 Brief at 7. They claim reliance on two cases: *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), and *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688 (2d Cir.1975), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1976). Neither case, however, stands for the proposition that a reviewing court may not consider a *clarifying opinion*, on the grounds that such an enlargement of judicial perspective would allow the agency to evade its responsibility to accompany its exercise of discretion with reasoned analysis. The Supreme Court's analysis in *Chenery* was founded on the principle that when Congress delegates to an administrative agency the discretion to administer and interpret a statute in light of its expertise and the public interest, it is the *agency* that must carry out that mandate. 318 U.S. at 92–95, 63 S.Ct. at 461–462. Thus the reviewing court may not step into the breach by adopting a position not offered by the agency itself acting in its statutory capacity. Insofar as is here relevant, *Chenery* holds only that an agency's decision must reflect the reasons for its action, and that subsequent rationalizations cannot be substituted on appeal for contemporaneous reasoned decisionmaking. *Id.; see Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962) (courts may not accept appellate counsel's *ex post facto* arguments as a substitute for the exercise of discretion by the agency itself). Similarly, *National Nutritional Foods* requires that an agency "adequately ... explain its actions," but specifically permits the court to seek and to consider further explanation. 512 F.2d at 701.

The agency in this case offered further explanation without judicial prompting. For that the ICC cannot be faulted. In addition, it must be recognized that petitioners *specifically requested* reopening of the ICC's decision. The ICC reopened, reconsidered, reviewed the record, and issued a new opinion, authorized by a majority of the acting Commissioners. Petitioners observe correctly that if the lawyer's brief for the ICC had simply announced its clarifying analysis in the form of allegations or new explanations, such would constitute pure post-hoc rationalization not entitled to any consideration by this court. The clarifying opinion of the Commission, however, differs sharply from after-the-fact rationalizations made by attorneys or by courts. Here, we are presented with the authorized explanations considered, adopted, and issued by a majority of the Commission panel, in the legitimate exercise of its statutory responsibility and discretion.

Concerning the impact of the second decision on our reviewing role, the procedure used by the ICC in this case was implicitly approved by the Supreme Court in *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). There the Court held that the ICC had power to reopen decisions and "add to the findings or firm them up as the Commission deems desirable, *absent*

*any collision* or *interference"* with the court. *Id.* 397 U.S. at 541, 90 S.Ct. at 1293 (emphasis added). Dual jurisdiction in this circumstance is not irregular. A petition for judicial review does not terminate the ICC's authority over a matter, though any subsequent administrative action must be consistent with the court's exercise of its jurisdiction. *Id.* at 541–42, 90 S.Ct. at 1293–94. In this case, as in *American Farm Lines*, there can be no argument that the ICC's second decision exceeded the authority delegated to it by Congress or interfered with this Court's jurisdiction. It is significant that we took cognizance of the ICC's decision to reopen, and deferred our review accordingly. Moreover, the Commission's improved decision undoubtedly facilitates this court's review by clarifying the issues involved. In terms of judicial economy, it would be a waste of time to review only the first opinion when the efforts of the parties and particularly the ICC have produced a better considered clarifying decision. We hold that the *second,* more closely considered decision is the agency action that should be the focus of our review.

### III. STATUTORY BACKGROUND TO THE ICC DECISION

#### A. *ICC Authority Over Decisions of State Commissions*

The Staggers Act specifically reserved to the state jurisdiction over intrastate rail rates, but with significant specific limitations:

> A State authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the Commission ... *if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.*

49 U.S.C. § 11501(b)(1) (emphasis added). The ICC must review the "standards and procedures" used by the state commissions to ensure that they "are in accordance with the standards and procedures applicable to regulation of rail carriers by the [ICC]."

*Id.* § 11501(b)(3)(A). State rail regulation thus must conform to the Interstate Commerce Act, as amended by the Staggers Act.

██ The ICC has a duty "to assure that *intrastate* regulatory jurisdiction is exercised in accordance with the [federal] standards." *Id.* § 10101a(9) (emphasis added). Accordingly, the ICC is required to review the standards and procedures of each state commission in order to determine whether they comply with federal law. *Id.* § 11501(b)(2), (3). Those states which do not comply will not receive ICC certification and may not regulate *intrastate* traffic. *Id.* § 11501(b)(4)(A). In addition, and more importantly for our purposes, even after the states are certified, their regulatory decisions may still be subjected to ICC review:

> Any rail carrier providing transportation subject to the jurisdiction of the [ICC] ... may petition the Commission to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an *intrastate rate,* classification, rule, or practice is determined, *on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of this subtitle.* The Commission shall take final action on any such petition within 30 days after the date it is received. If the Commission determines that the standards and procedures were not in accordance with the provisions of this subtitle, its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule, or practice.

*Id.* § 11501(c) (emphasis added). This continuing ICC supervision was necessary, in the eyes of Congress, given the prior history of the inadequacy of intrastate rates as set by state public service commissions, "to ensure that the price and service flexibility goals of the [Staggers] Act are not undermined by state regulation of rates, practices, etc., which are not in accordance with these [federal] goals." H.Conf.Rep. No. 96–1430, 96th Cong., 2d Sess. 106 (1980),

*reprinted in* 1980 U.S.Code Cong. & Ad. News 3978, 4110, 4138; *see* H.R.Rep. No. 96–1035, 96th Cong., 2d Sess. 61 (1980), U.S.Code Cong. & Admin.News 1980 p. 3978 (*estimating $400 million shortfall in railroad revenues for 1977 alone,* due to disparity between interstate and intrastate rates). Congress intended to stop the evil of interstate traffic rates being forced to subsidize intrastate carriage. In this particular case the ICC's review revealed a situation which authorized it to set aside the order of a state commission since "the standards and procedures applied by the State were not in accordance with the provisions of [the Staggers Act.]" 49 U.S.C. § 11501(c).

█ We recently held in *Utah Power & Light Co., supra,* at 734, after extensive analysis of the Staggers Act and its legislative history, and in particular the text and background of section 11501(c), that the ICC has broad authority to review state commission rate decisions. The ICC's section 11501(c) jurisdiction is not of a limited appellate nature, but in a proper case is plenary, and may allow the ICC to delve into the factual record before the state agency. *Id.*

B. *The Staggers Act and its Balancing Approach in Ratemaking*

█ The Staggers Act specifically removes ICC and state jurisdiction over railroad rates applicable to *competitive* rail traffic. The ICC and the states, however, continue to exert jurisdiction over rates where a railroad "has market dominance over the transportation to which the rate applies." 49 U.S.C. § 10709(c). Under the Act, a rail carrier does not have market dominance with respect to a particular rate if the rate is less than 175% (165% at the time this case arose) of the railroad's variable cost. *Id.* § 10709(d)(2). Yet Congress specifically provided that a rail rate greater than 175% of variable costs does "*not es-*

tablish a presumption" either that the railroad is market dominant, or that the rate is unreasonable. *Id.* § 10709(d)(4) (emphasis added). Those issues must be determined on a case-by-case basis.

█ In ratemaking as well as generally, the present statutory system of national rail regulation is designed to accomplish a number of objectives:

> In regulating the railroad industry, it is the policy of the United States Government—
>
> .     .     .     .     .
>
> (3) to promote a safe and efficient rail transportation system by *allowing rail carriers to earn adequate revenues,* as determined by the Interstate Commerce Commission;[8]
>
> (4) to ensure the development and continuation of a sound rail transportation system with *effective competition among rail carriers* and with other modes . . .;
>
> .     .     .     .     .
>
> (6) *to maintain reasonable rates where there is an absence of effective competition* and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;
>
> .     .     .     .     .
>
> (9) to cooperate with the States on transportation matters to assure that *intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;* [and]
>
> (10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation. . . .

49 U.S.C. § 10101a (emphasis added). These policy pronouncements serve as an apt introduction to an act that requires the ICC to balance various factors in determin-

---

**8.** The problem addressed by Congress is currently reflected by the fact that the ICC determined that the composite railroad cost of capital—1982 was 17.7 percent (ICC-Ex Parte No. 436, July 22, 1983) and that *every* Class I Rail-road in America was *revenue inadequate* (ICC-Ex Parte No. 450, August 17, 1983). The Norfolk & Western had the highest return on investment—8.03 percent. *Id.*

ing rail rates; they are just as applicable to interstate rates as they are when the ICC is required to review *intrastate* rates.

Among the primary concerns of the Congress that enacted the Staggers Act—and concerns recurrently addressed by the Act—was to ensure that railroads receive revenues adequate "to cover total operating expenses ... for a *sound* transportation system ..." (emphasis added) and to provide a reasonable return on their enormous capital investments. 49 U.S.C. § 10704. Given such focus, it is not surprising to find Congress explicitly providing that the importance of revenue adequacy *must* be stressed in ratemaking under the Act. In one important provision, Congress required:

> In determining whether a rate established by a rail carrier is reasonable ... the commission *shall recognize the policy* of this [sub]title that rail carriers *shall earn adequate revenues*, as established by the Commission....

*Id.* § 10701a(b)(3) (emphasis added). The Commission's responsibility to "allow rail carriers to earn adequate revenues," *id.* § 10101a(3), is elsewhere reinforced:

> The Commission shall maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under that subchapter that are adequate, under honest, economical, and efficient management, to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. *The Commission shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph.*

*Id.* § 10704(a)(2) (emphasis added); *see also* H.R.Rep. No. 96–1035, 96th Cong., 2d Sess. 54 (1980), U.S.Code Cong. & Admin.News 1980, p. 3999 (expressing a "clear directive to ensure financially sound railroads").

▇▇▇ Revenue adequacy is not, of course, the only consideration in Staggers Act ratemaking. Indeed, concern that some captive shippers would be forced to shoulder an unfair burden in the provision of revenues to the railroads prompted Congress to include other efficiency related factors for mandatory consideration. For example, the Staggers Act provides:

> (B) In determining whether to investigate or not to investigate any proposed rate increase ... the Commission shall set forth its reasons therefor, giving due consideration to the following factors:
>
> (i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic;
>
> (ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and
>
> (iii) the impact of the proposed rate or rate increase on the attainment of the national energy goals and the rail transportation policy under section 10101a of this title, taking into account the railroads' role as a primary source of energy transportation and the need for a sound rail transportation system in accordance with the revenue adequacy goals of section 10704 of this title.

> * * * * *

> (C) In determining whether a rate is reasonable, the Commission shall consider, among other factors, evidence of the following:
>
> (i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic;
>
> (ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and
>
> (iii) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues.

49 U.S.C. § 10707a(e)(2)(B), (C) (Long-Cannon amendment); *see also id.* § 10704(a)(2) ("honest, economical, and efficient management"). Even in including these so-called "Long-Cannon factors," however, Congress carefully avoided attaching any particular weights to the various concerns that must be taken into account. Nor did Congress attempt to prescribe the relative weights that state commissions should assign to these various factors in determining reasonableness: the overall scheme calls for a flexible, non-mechanical approach to rate-making. Each factor must be given genuine consideration and some weight in setting both interstate and intrastate rates. By the same token, neither the ICC nor the state agencies can select any *one* factor as controlling.

■ The ICC has not issued, through any rulemaking proceeding, further specific guidelines as to rate reasonableness, although it has annually determined the revenue adequacy (or inadequacy) of the operating railroads.[9] The absence of any standard-setting by administrative rulemaking, however, does not leave a complete void. The *Staggers Act itself* sets certain standards that must be followed by the ICC and state commissions alike. *See Wheeling-Pittsburgh Steel Corp. v. ICC*, 723 F.2d 346, 354–55 (3d Cir.1983). Here, the ICC determined that the decision of the Indiana Commission did not comport with certain standards directly established by the Staggers Act. It is that determination that we must review.

### IV. THE ICC'S REVIEW OF THE INDIANA DECISION

■ In *Utah Power & Light Co., supra,* at 734, we held that while our review of the ICC's section 11501(c) decisions is necessarily deferential, the Commission's authority under that provision to review

state commission decisions is plenary. Under the Staggers Act, the ICC, when reviewing rate determinations made by state authorities, is authorized and indeed obligated to penetrate below the surface of the state opinion to the substance. A state commission should not be allowed to effectively shield its decision from review by merely articulating the proper federal standards, while improperly finding the facts, misapplying law to facts, or giving inordinate weight to isolated concerns. Lip-service is not enough. The applicable federal standards must be faithfully applied.

In our view, the approach of the Indiana Commission to this case falls well short of evenhanded, correct and faithful application of federal standards. The state's handling of the case is so one-sided as to appear to have been purely result-oriented—the desired result being the lowest possible rate. The state commission apparently decided to believe all of the shippers' cost evidence, and to disbelieve all of the railroad's cost evidence, and to end up arriving at the lowest possible cost figure. Next, the Indiana Commission acknowledged, as it was bound to do, that the ICC had determined the L & N to be revenue inadequate. The state went on, though, to hold that the authority of the L & N to utilize differential pricing was further contingent on its demonstrating its efficiency. Having diverted the case onto the solitary "efficiency track," the Indiana Commission then compared the L & N to the Southern which has a reputation as one of the nation's most efficient railroads, disbelieved all of the L & N's evidence, and ultimately found it to be "inefficient." Finally, on that basis, the state commission reduced the existing rate to the jurisdictional threshold—the lowest level permitted by law.

---

9. The ICC's on-going proceeding, Ex Parte No. 347, Coal Rate Guidelines—Nationwide, has resulted in no uniform standard of reasonableness or across-the-board formula. Instead, the ICC in that proceeding has stated little more than that differential pricing is "an important tool in assisting the railroads toward revenue adequa-

cy," and that "a strict cost approach" is not a proper solution. Ex Parte No. 347, Coal Rate Guidelines—Nationwide (Sub. No. 1) 3, 8 (I.C.C. Dec. 21, 1981); *see also* Ex Parte No. 347, Coal Rate Guidelines—Nationwide (Sub. No. 1) (I.C.C. Feb. 24, 1983) (proposed guidelines).

In defense of the state commission's approach, petitioners argue that because the Indiana Commission announced that it was applying proper standards, and made detailed findings of fact, the ICC has no authority to set aside the Indiana rates. We reject this restricted view of the Commission's authority. Adoption of such principles would shield from review many, if not most, state rate decisions. As in this case, a state agency could accept all of the shippers' evidence and reject all of the railroad's evidence and then intrastate shippers could argue that determinations of the "finder of fact" cannot be reviewed. Or, as in this case, the state could compare any railroad to a "more efficient" competitor— only *one* railroad, after all, could ever be the *most* efficient—find the subject railroad to be inefficient, and set its rate at the jurisdictional threshold. We do not interpret the Staggers Act as allowing such shields to prevail. They are nothing more than transparent devices to evade the federal standards and procedures that Congress enacted in the Staggers Act to ensure that intrastate traffic would contribute a fairer share, in comparison with interstate and competitive traffic, of the revenue necessary to sustain a "sound" rail transportation system. Given the demonstrated historical propensity of state public service commissions to set intrastate rates at unreasonably low levels (Congress estimated a $400 million revenue shortfall in 1977 due to the gap between interstate and intrastate rates [10]), petitioner's construct would effectively foil much of the congressional intent behind the Staggers Act. Accordingly, the ICC—like a court acting in a reviewing capacity—must have ample authority to carefully scrutinize the record to determine that the state agency has properly applied the law.

■ Scrutinizing the record in this case, the ICC found several basic flaws in the approach taken by the Indiana Commission: the state commission (1) held that the railroad was entitled to use differential pricing and to receive assistance in attaining revenue adequacy *only* if it was not "inefficient;" (2) transferred the burden of demonstrating efficiency to the railroad; (3) apparently used a mechanical test to hold that an inefficient railroad's rates should be set approximately at the jurisdictional threshold; (4) failed rationally to relate the rate reduction to the finding of inefficiency; and (5) relied on evidence insufficient as a matter of law to prove "inefficiency." We find that each of the ICC's reasons for reversing the Indiana Commission is entirely sound. The ICC and the federal courts must be allowed to protect against this kind of narrow, parochial protectionism, violative of both the letter and spirit of the Staggers Act. We consider in turn each violation of the federal statute.

### A. *Conditioning Differential Pricing on Efficiency*

In its central error of law, the Indiana Commission held that the L & N was entitled to use differential pricing to attain revenue adequacy *only* if its management was demonstrably efficient:

> 54. Under Staggers the L & N is entitled to assistance in attaining revenue adequacy only 'under honest, economical and efficient management'.

Indiana Decision at 19 (JA 153). The ICC ruled that this was a fundamental misconstruction of the statute. We agree. To be sure, the Staggers Act requires that railroad rates should be "adequate, under honest, economical, and efficient management, to cover total operating expenses, ... including a reasonable and economic profit or return (or both) on capital employed in the

---

**10.** H.R.Rep. No. 96–1035; 96th Cong., 2d Sess. (May 16, 1980):

This disparate treatment of intrastate and interstate traffic is reflected in the difference between the average revenue to variable cost ratios for each type of traffic: 1.20 for intrastate traffic and 1.36 for interstate traffic in

1977. If the intrastate ratio had been equal to the interstate ratio that year, the railroads would have earned $400 million in additional revenues.

*Id.* at 61, U.S.Code Cong. & Admin.News 1980, p. 4006.

business." 49 U.S.C. § 10704(a)(2). This is far from saying, however, that the right to use differential pricing and the goal of revenue adequacy are *entirely contingent* upon demonstrating "efficiency" to a state agency's satisfaction. One statutory factor cannot be isolated out of context, or blindly exalted at the expense of others that are at least co-equal in importance.

■ In contrast with the restricted view of the Indiana Commission, the ICC held that "carrier 'efficiency' [is] a factor that must be considered in determining the reasonableness of a challenged rate." ICC June Decision at 7 (JA 12). The Commission pointed to the Long-Cannon amendment to the Staggers Act, 49 U.S.C. § 10707a(e)(2)(C), *supra*, which helps to explain how efficiency evidence is to be used. Under that section the ICC must consider: (1) the amount of traffic that does not pay its way; (2) the attempts made to minimize such traffic; (3) the amount of low-profit traffic; and (4) the attempts made to increase profits on such traffic. The ICC then indicated the role that efficiency must play:

> The statute does not specify how these efficiency factors should be considered. It certainly does not mandate that a general showing of "inefficiency" bars any further rate increases or requires reduction of all existing rates to the jurisdictional threshold. Rather, by emphasizing the revenue adequacy policy, and making the efficiency factors "considerations" without specifying how they should affect the rate reasonableness issue, the statute leaves no doubt that the two considerations must be balanced together.

ICC June Decision at 7–8 (JA 12–13) (emphasis added). This ICC interpretation of the Staggers Act, a recent enactment, is entitled to substantial deference. Under Supreme Court precedent, it is well-established that a court should defer to "the interpretation given [a] statute by the officers or agency charged with its administration ... '[p]articularly ... when the administrative practice at stake "involves *con-*

*temporaneous construction* of a statute by the men charged with a responsibility with setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet *untried and new.*" ' " *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961); quoting in turn *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)) (emphasis added); *see Quern v. Mandley*, 436 U.S. 725, 744, n. 19, 98 S.Ct. 2068, 2079 n. 19, 56 L.Ed.2d 658 (1978); *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397 (1931) (citing cases); *cf. Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 351–52, 4 L.Ed. 97 (1816) (approving legislative act as contemporaneous exposition of the Constitution, long continued).

■ In addition, as discussed *supra*, section III(B) of this opinion, the ICC's view that the Staggers Act requires a balance of factors in ratemaking is fully consistent with both the statutory language and legislative history. We adopt that interpretation. The whole thrust of ratemaking under the Act is *balancing*. By failing to balance efficiency against revenue adequacy—thereby, in effect, entirely eliminating consideration of the proper contribution to the attainment of revenue adequacy because of alleged inefficiency—the Indiana Commission misinterpreted the Staggers Act. That legal error pervades its entire opinion and alone justifies setting aside the rate determination of the Indiana Commission.

### B. *The Burden of Proof*

■ The Indiana Commission next took the following step:

> 55. Although the burden of proving the assailed rate is unreasonable is upon [the Utility], once it has come forward with evidence showing that the management of L & N is not "honest, economical

and efficient" the burden of rebutting such *allegation* in order to demonstrate entitlement to differential pricing above the Staggers mandate of 165% shifts to the L & N.

Indiana Decision at 19 (JA 153) (emphasis added). The Indiana Commission thereby basically held that if a shipper who is challenging a rate presents allegations that the state agency considers to be a *prima facie* case of inefficiency—*i.e.*, that the railroad is less efficient than *one* other railroad— the burden switches to the railroad "to demonstrate entitlement to differential pricing" above the Staggers Act jurisdictional threshold. *Id.*

The Indiana Commission offers no authority for this shifting of the burden of proof. Ordinarily, the shipper challenging a rate determination by the ICC based on market dominance has "the burden of proving that such rate is not reasonable ..." The *shipper* here, not the railroad, must prove that the rate is *un*reasonable. 49 U.S.C. § 10701a(b)(2). There was no reason to deviate from or to ignore that rule, which constitutes a federal standard. While the Indiana Commission correctly quoted the Staggers Act standards, its conclusion that the burden of proof shifted to the L & N to prove the factors upon which the reasonableness of the rate rested renders its conclusion seriously defective. The state commission concluded: "the L & N has not presented convincing evidence that its management is efficient and economical." Indiana Decision at 23 (JA 157). This is completely backwards, and constitutes error justifying the invalidation of the rate determination. While the burden of proceeding might shift on a complete showing, the burden of proof under the statute is upon the party challenging the rate. 49 U.S.C. § 10701a(b)(2)(A).

### C. The "Mechanical Test" of Setting the Rate at the Lowest Level

The Indiana Commission also held that if a railroad is found to be inefficient, the carrier is not "entitle[d] to differential pricing above the Staggers mandate of 165%." Indiana Decision at 19 (JA 153). The ICC quite reasonably interprets this decision by the state commission as holding that the Staggers Act 165% jurisdictional threshold is presumptively the proper rate unless a railroad is found to be "efficient." Such construction by the Indiana Commission is erroneous. The Staggers Act clearly states to the contrary, that a rate at or above the jurisdictional threshold "does *not* establish a presumption that ... the proposed rate exceeds or does not exceed a reasonable maximum." 49 U.S.C. § 10709(d)(4) (emphasis added). This statutory provision explicitly rejects the drawing of any inference that the 165% rate was presumptively the *maximum* valid rate, or that rates over 165% have to be specially justified. In holding that, because the rate exceeded 165%, the L & N was required to prove its "efficiency," the Indiana Commission misinterpreted the Act. This "mechanical test," as the ICC characterizes it, is contrary to the rate flexibility required by Staggers.

### D. Absence of Rational Basis

The ICC points out that the approach of the Indiana Commission apparently was to rule that a railroad it found to be "inefficient" could not set any rate above the jurisdictional threshold. As the ICC notes, this construction is entirely arbitrary, and could well result in reducing a fair rate to a point far out of proportion to the alleged wrong. If, for example, the L & N loses $10 million a year through inefficiencies, it is contrary to the purposes of the Staggers Act, and to common sense, to force its rates down to a level where its income is reduced by $20 million. No national congressional purpose could be served by cutting the revenues of an already revenue-inadequate railroad by an amount unrelated to the extent of the alleged inefficiency. In this case, the Indiana Commission never determined the amount of money that alleged inefficiencies cost the L & N; no evidence of dollar amounts appears to have been produced. It was, therefore, impossible for the ICC to tell, even if the state's theory was correct, whether the state's

rate slashing was too much or too little. Such a crude approach falls well short of the reasoned decision making, in a balanced manner, required by the Staggers Act. The *balancing* aspect of the statute requires some attempt to tailor the remedy, rate reduction, to the goal, improving efficiency.[11] No such attempt was made here.

### E. *Insufficiency of Evidence*

■ Finally, the ICC held that even if the Indiana Commission correctly construed the law, the evidence was insufficient to support a finding of "inefficiency." The evidence relied on by the Indiana Commission was as follows:

1.  One witness, Professor Lerner, testified that L & N's profit margin of 6% was less than that of its parent company, CSX, which was 10%. He concluded that "the management of L & N is not as efficient as the management in other parts of the CSX." He stated, however, that "other reasons for differences in profit margin, for example *differences in operating characteristics*, might be responsible [for the discrepancy, but] ... he had not attempted to determine reasons for such differences." Indiana Decision at 19–20 (JA 153–54).

2.  Another witness compared the L & N to the Southern Railway, and found that the Southern was more efficient in "freight car, locomotive, labor, and track utilization." Indiana Decision at 19 (JA 153).

3.  Testimony of L & N management indicating that the railroad L & N bases its pricing decisions on the expertise of its management, and does not rely on sophisticated marketing tools such as demand elasticity studies. Indiana Decision at 21, 24 (JA 155, 158). (Emphasis added.)

The Indiana Commission then, because the L & N relied solely on the expertise of its

pricing officials, rejected its evidence of efficiency, and summarily dismissed L & N's efforts to improve efficiency as "commendable. but ... of limited scope." Indiana Decision at 22 (JA 156). The shippers' evidence in this case had some slight probative value on the issue of fact regarding efficiency. Petitioners contend, however, that the ICC was bound to leave undisturbed the fact-finding determinations of the Indiana Commission. As this court held in *Yellow Taxi Co. of Minneapolis v. N.L.R.B.*, 721 F.2d 366, 382–84 & n. 37, 39 (D.C.Cir.1983), however, even federal agencies are not free to manipulate their findings of facts as a means of avoiding judicial review of their ultimate conclusions. In addition, the rate-determination responsibility vested in the ICC by section 11501(c) of the Act, *supra*, and the legislative history of that section, make it clear that the ICC, in order to carry out Congress' scheme, has ample authority to examine facts to the degree necessary to assure that the state is treating interstate rail carriers fairly.

In this case, the Indiana Commission's factual handling of the efficiency question suggests manipulation. In particular, for instance, the state commission focused on a comparison of the L & N to the Southern Railway, which has a general reputation of being one of the nation's most efficient and profitable railroads. *See* Petitioner's Brief at 28–29 (defending the comparison of the L & N to the Southern). If the Indiana Commission wants to inquire into efficiency, which it is certainly entitled to do, then it must do so on a more even-handed basis, in a manner that involves comparisons with a representative sampling of carriers during a relevant period of time (carriers having similar operating characteristics and profit potential) and that takes account of factors beyond the control of the railroad but potentially pertinent to its relative efficiency (*e.g.*, differences in grades, operating characteristics, competition and other

---

**11.** It is obvious that the Indiana Commission's approach could result in even *less* efficiency, since frequently an influx of additional cash may be necessary to pay for system improve-

ments. Drying up revenues may not result in efficiency; it may only result in less efficiency, and eventually in bankruptcies.

relevant factors). This the state commission did not do.

The Indiana Commission based its conclusion that the L & N was "inefficient" largely on a comparison of its profits with those of CSX, its parent, and with those of the Southern Railway based on financial operating data for one year, 1980. The comparison to the remaining subsidiaries of CSX can be ignored because the complainants' evidence did not probe any operating differences that might justify differences in profit margins. *But see* discussion below. Differences in operating characteristics, which were not considered, could well cause a difference in profits.

This left the finding by the Indiana Commission of "inefficiency" resting principally upon the comparison of L & N's operating performance to that of its closest competitor, the Southern Railway System. The comparative data in this respect indicated that for the year 1980 the L & N had a return on investment of 5.5 percent and the Southern had a return on investment of 7.8 percent. 365 I.C.C. 285–88. Here again complainants made an inadequate attempt to support their contention by failing to determine whether the different results could be attributed to differences in operating characteristics or other justifiable factors. It is absurd to determine the "efficiency" of a railroad by comparing it to another railroad without considering the differences, if any, between the two railroads' operating characteristics. And it is even more absurd to base such determination on a single year's operation. Railroad profits from year to year are highly volatile. They depend substantially upon the area the railroads serve, their operating conditions from year to year, financial conditions, their financial structure, the effect of the weather on crops, on operating conditions, the cost of fuel, the state of the local and national economy, the cost of disasters, and many other factors.

To illustrate the fatal defect of attempting to compare the rate of return of L & N to that of the Southern on the basis of the single year 1980, one need go no further than the financial data for the next two years. In 1981 the L & N *increased* its return to 7.04 percent while that of the Southern *dropped* slightly to 7.71 percent—a commendable showing by the L & N. 47 Fed.Reg. 52237–52238. But more importantly in 1982 the L & N bettered the Southern by earning 4.87 percent while the Southern's earnings fell to 4.36 percent. (ICC–Ex Parte No. 450 August 17, 1983). The Indiana Commission's highly selective comparison is self-evidently flawed.

The Indiana Commission's comparison of the L & N's 5.5 (6%) percent profit to the one year 10 percent profit of its parent CSX, however, is even more inapt. The CSX is *not* a railroad. It is a holding company—the parent of the Seaboard which absorbed the L & N by merger on December 29, 1982. Seaboard Brief at v. The Rule 8(c) certificate filed in this case by the Seaboard for itself and the L & N, both subsidiaries of CSX, indicates that the CSX is involved through subsidiary corporations in many other businesses other than railroads, including hotels and mineral and resources exploration and development. The listed affiliates of the L & N, through the parent CSX holding company, totalled 142 separate companies, Seaboard Brief at i–vi, and during this proceeding CSX acquired an additional 42 subsidiary companies. *Id.* at v–vi. So it was clearly erroneous for the Indiana Commission to rule that the L & N was "inefficient" because its holding company parent had a profit of 10 percent in 1980 and the L & N had a profit of 5.5 percent. The two companies are not comparable.

But let us pursue the Indiana Commission's theory further. The Rule 8(c) certificate, *supra*, indicates that CSX is the holding company for four Class I *railroads* as subsidiaries. Let us compare the profits for the last three years of these four railroads in the CSX portfolio.

ICC—Return on Investment

|  | L&N | C&O (Chessie) | Seaboard | B&O [12] |
|---|---|---|---|---|
| 1980 [13] | 5.5% | 6.8% | 7.0% | 3.8% |
| 1981 [14] | 7.04 | 5.38 | 2.10 | 2.37 |
| 1982 [15] | 4.87 | 5.33 | 1.38 | 0.35 |
| Average | 5.80% | 5.86% | 3.49% | 2.17% |

This data shows the complete folly of resting a finding of "inefficiency" on such irrelevant evidence as the 10 percent return that CSX earned from its entire operation as a holding company. If we make a relevant comparison—to other Class I Railroads—we find the L & N's average return on investment for the past three years exceeds that of two of CSX's Class I Railroad subsidiaries and is within 6/100ths (.06%) percent of the C & O, the best performing Class I Railroad in the CSX portfolio. In fact, of the 42 Class I railroads included in the 1982 ICC Revenue Adequacy Report, the most recent, the L & N ranked a very creditable 9th.

Based on 1980 data a railroad was found to be revenue adequate under the standards of the Staggers Act if it had a return on investment of 12.1 percent or higher. 365 I.C.C. 286. For 1981 the Railroad Cost of Capital had risen to 16.5 percent. 47 Fed.Reg. 52236. In 1982 it was 17.7 percent. ICC–Ex Parte No. 436, July 22, 1983.

Recognizing all of the foregoing, it is obvious that substantial evidence does not support the ruling of the Indiana Commission that the L & N was "inefficient," or support the Commission's basic ruling that the burden of proceeding had shifted to the L & N to prove its efficiency. We agree with the ICC that complainants never satisfied the evidentiary requirements that would call for shifting the burden of proceeding to the L & N, much less placing upon the L & N the burden of proving that it was "efficient." Thus, on this record there was insufficient credible evidence for

the agency to reasonably find the L & N to be "inefficient."

## VI. THE FEDERAL STANDARDS ESTABLISHED IN THE STAGGERS ACT

■ Beyond their defense of the Indiana decision, petitioners' chief argument is that the Indiana Commission could not have violated a federal standard or procedure, within the meaning of section 11501(c), because the ICC has not adopted any national standard of revenue adequacy. This contention has a certain disingenuous appeal, but ultimately fails. It is true that the ICC has not promulgated, through any generic rulemaking, any national standard for maximum rail rates or overall revenue adequacy. The problem with the petitioners' argument, though, is that the ICC found that the approach of the Indiana Commission violated the provisions of the Staggers Act, *not* ICC revenue adequacy standards. The Act itself establishes federal standards that must be observed. *See Utah Power & Light Co., supra*, at 737; *Wheeling-Pittsburgh Steel Corp. v. ICC*, 723 F.2d 346, 354–55 (3d Cir.1983). This the complainants did not do.

Petitioners rely heavily on *Kentucky Utilities Co. v. ICC*, 721 F.2d 537 (6th Cir.1983), in which the ICC reversed the Kentucky Utilities Commission for using a rate method which, though consistent with the Staggers Act, differed from the formula *subsequently* approved by the ICC. The Sixth Circuit struck down the ICC's action: the ICC could not, according to the court, reverse a state commission for violating an ICC promulgated standard when it had not

---

**12.** The Baltimore & Ohio Railroad is also affiliated with the CSX Corporation. *See* Seaboard Brief, Rule 8(c) Certificate at i, ii.

**13.** 365 I.C.C. 288.

**14.** 47 Fed.Reg. 52238.

**15.** ICC-Ex Parte No. 450, August 17, 1983.

adopted any general standard. *Id.* at 544–45. There is a clear distinction, however, between *Kentucky Utilities* and this case. Here, the ICC has found the state decision to be in direct violation of the Staggers Act and the balancing approach that it entails. The ICC is challenging not the use or misuse of a particular rate formula, but rather the misinterpretation of the statute, the failure to balance faithfully and fairly the *statutory* factors. Thus, *Kentucky Utilities* simply has no application to this case. The rule sought to be applied by the petitioners would mean that the ICC would be entirely impotent to effectuate Congress' intent unless and until final revenue adequacy guidelines are adopted. Such a holding would immediately gut much of the Staggers Act. While modern regulatory practice has increasingly focused on the promulgation and enforcement of standards through rulemaking, it is well to remember that Congress itself can—and often does—establish federal standards. In the immediate context, the Staggers Act required the weighing of a number of statutory factors, and that some considerable weight be accorded to revenue adequacy. State proceedings that fail to heed these congressional pronouncements must be reversed by the ICC in the exercise of its section 11501(c) jurisdiction.

VII. Reinstatement of the L & N Rate

■ Having determined that the Indiana Commission's decision was inconsistent with federal standards, the ICC was further obligated by the statute to "determine and authorize the carrier to establish the appropriate rate ....." 49 U.S.C. § 11501(c). The Commission's rate-determination responsibility is distinct from its review of state proceedings, but both responsibilities must be discharged within the statutory thirty-day period for final action. As the Commission itself has recognized in this very proceeding, it "cannot remand the case to the state authority, but must establish an appropriate rate in the same decision ....." ICC June Decision at 20. In *Utah Power & Light Co., supra,* at 738, we

accepted that interpretation of the Commission's authority.

In this case, the ICC determined that the "appropriate rate" was the existing rate of $.94/ton that had been set by L & N. In arriving at that determination, the Commission calculated a revised figure for variable costs, found the resulting ratio of revenue to variable costs to lie within the "reasonable" range established by applicable ICC precedents, and noted its concern for the railroad's revenue inadequacy. ICC November Decision at 6 (accompanied by appendix on costs) (JA 74, 77–79); ICC June Decision at 20–21 (JA 25–26). In its second opinion, the ICC added that the existing rate was "well below that of other intrastate and *interstate* unit-train coal rates in the area," the latter comparison being relevant due to the statutory policy of closing the gap between intrastate and interstate rates. ICC June Decision at 20 (JA 25). Finally, the ICC held that in the absence of a showing by complainants of unreasonableness, the carrier's rate would be allowed to stand; this was not a maximum reasonable rate, said the Commission, but only *a* reasonable rate that should not be lowered on the record in these proceedings. *Id.* at 21 (JA 26).

Petitioners challenge the ICC's rate determination, complaining that the Commission did not explain its decision to authorize the existing rate, and indeed allegedly ignored various statutory concerns in so doing. This argument appears to be a variant of petitioners' complaint, discussed *supra,* that the Commission has established no general standard of rate reasonableness. In addition, it should be emphasized that petitioners have launched a sweeping attack on the ICC's exercise of its authority, rather than pointing to any *specific* deficiencies in the cost findings or analysis of revenue-to-cost ratios. Before this court, petitioners have merely defended the finality of the Indiana Commission's fact finding concerning costs, without regard to the substance.

■ We must decide whether the Commission has adequately supported and justi-

757575757575= 771

fied its "appropriate rate" determination. In so doing, we are mindful that the ICC has been setting railroad rates for close to a century now, and that its accumulated expertise in such matters far exceeds that of any court. Our review in ratemaking cases is deferential. *See supra.* We are also aware that the Commission is presently working under a fairly fresh, and substantially reformed congressional mandate, in the form of the Staggers Act. Congress did not define what it meant by the term "appropriate" as employed in section 11501(c). Moreover, the Commission has not yet interpreted the relationship of section 11501(c) "appropriateness" to the "reasonableness" determinations elsewhere required by the Staggers Act. *See Utah Power & Light Co. v. ICC, supra,* at 735. Nor need we do so in order to decide this case. We note only that the section 11501(c) mandate to "determine and authorize ... the appropriate rate" does not call for the Commission to "prescribe" a rate within the meaning of *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932).

In the absence of any specific criticisms by petitioners of the ICC's cost findings, we cannot find inadequate the cost evidence supporting the Commission's rate determination. Nor were the figures and use of precedents for revenue to variable cost ratios inadequately reasoned or presented. From its opinion and cost appendix, it appears that the Commission articulated and took into consideration relevant statutory factors. In the absence of any specific statutory guidance as to how an "appropriate rate" must be derived, we cannot require more from the Commission than the provision of substantial evidence, consistency with the statute, and reasoned decisionmaking. We are thus constrained to find that from its decision and opinions, the ICC's "path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

VIII. Conclusion

For the reasons herein before stated, we affirm the decisions of the ICC in 83–2399 and 83–1691 in their entirety.

*Judgment accordingly.*